Good afternoon. This is case 3-19-0102, John Webb Appellant v. Anthony Iaderosa, Jr. et. al. and Lakeside Bank, Appalachia. All right. Mr. Huseman, is that correct? Correct, Your Honor. Before you do, I should say that Justice Schmidt is on this panel, but he was unable to be here today. For that, we apologize, but he will participate in the case fully. He will listen to the oral argument and, as I said, participate with Justice Schmidt and me at that time. So, if you want to begin, please do. Thank you very much, Your Honor. Good afternoon, and may it please the Court. My name is Mike Huseman, and I represent the appellant, John Webb. We're appealing the Circuit Court's dismissal of counts 11 and 12 from our third amended complaint out of Will County. The Circuit Court ruled against the plaintiff on the issues of duty, proximate cause, and damages, and we'll address those issues today. With respect to the issue of duty, Your Honor, Your Honors, the Court stated that, and I quote, there is not facts under which the Court finds that a common law duty runs from lakeside to plaintiff. Plaintiff does cite to federal regulations it believes the bank failed to comply with, but I don't read that to show that there is any extension of duty to plaintiff. Plaintiff cannot allege that Ida Rosa's gambling activities occurred during the scope of employment, and there must be a causal link between the hiring of the employee and the alleged damage. The problem with that, of course, Your Honors, is that we did not have to allege that the gambling occurred during the scope of Mr. Ida Rosa's employment. Counts 11 and 12 were alleged direct negligence claims against the bank for its own actions and inactions. If we had been seeking to hold the bank liable for Mr. Ida Rosa's activities under a theory of vicarious liability, we would have had to allege that his gambling activities occurred during the scope of his employment. But these are direct claims against the bank. Mr. Huisman, before you go on, could you explain why we have employment here? Why we have employment? Yes. Yes. Well, the allegation, all well-pleaded facts, we believe, are taken as true for purposes of this motion. And we've alleged employment and we've alleged the steps that he takes on behalf of the bank. We, of course, never got into discovery to determine what, if anything else, he had done. But the allegations are that he essentially acquires business for the bank and is an agent of the bank. Okay. Thank you. And with respect, another point that we raise, another issue that we take with the court's ruling on duty is that the court relied upon this unpublished opinion, the Rodriguez versus Marrero case, M-A-R-R-E-R-O. That was the only case cited by the bank at the hearing on their motion to dismiss. And yet they argue in this appeal that the court didn't rely upon it, even though that was the only case they argued about. On appeal here, the bank cites the La Plume case, L-A-P-L-U-M-E, for the bank's theory that a court can cite to an unpublished opinion, not for authority, but as an example of the court's reasoning and as a reasonability check. But that case, La Plume, is distinguishable and it's inapplicable because in that case, it was the appellate court itself that had cited to an unpublished opinion in its own opinion as a quote-unquote reasonability check and for an example of another court holding similarly. That's entirely different than what happened here in our case where a party cited an unpublished opinion to the court, used it as the only case they argued at the hearing, and the court relied upon it. We think it was improper for the bank to cite the case and we think it was improper for the court to rely upon it. But if you actually look at that case, getting to the substance of that Rodriguez case, it's distinguishable anyway because in that case, the plaintiff was alleging that the bank had violated certain know-your-customer regulations that were designed to generally stop money laundering. The plaintiff in that case did not allege that he was specifically part of a protected class of individuals that the statute was designed to protect. Here in our case, we cite to the Unlawful Internet Gambling Enforcement Act, which specifically identifies unlawful internet gambling as a particular cause of concern for banks and for the consumer credit industry in general. And we allege that John Webb, the plaintiff, is a consumer as that term is defined in the implementing regulations of this federal statute. That he's a member of the class that the statute was enacted to protect. He was duped, he was defrauded, and he had money stolen from him. These are our allegations that remain in the third amended complaint by a bookmaker over the internet. That's the exact situation that the UIGEA was enacted to prevent. We have much more specific details than the plaintiff had in that Rodriguez case. And the fact of the matter is Lakeside Bank dropped the ball at every step. The bookmaker was employed by the bank. He's still employed by the bank. They were loaning him millions of dollars throughout this entire process. So, and additionally, your honors, if you look at paragraph 61 of our third amended complaint, that's contained on page 1033 of the record. We allege that this specific duty owed from the bank to consumers generally to identify and stop unlawful internet gambling is distinguishable from any other general duty that may be out there to stop money laundering, Ponzi schemes, etc. under federal law. I don't know if those duties even exist out there, but what we do know is that the UIGEA was enacted to prevent this exact situation that occurred in this case. And for that reason, Rodriguez is distinguishable, and it was an error for the circuit court to rely upon it, whether that violated Rule 23 or not. More importantly, and getting to the heart of the duty analysis here, we think the circuit court ignored the two Illinois Supreme Court cases that we cited in response to the motion to dismiss. Those two cases were Bencura v. Catrus, 288, Illinois 2nd, 352, and Noyola v. Board of Education, 179, Illinois 2nd, 121. Both of these cases support the duty allegations as alleged in our third amended complaint. In both of those cases, the Illinois Supreme Court held that where a defendant violates legislated rules, a plaintiff who belongs to the class intended to be protected by those rules may recover upon establishing that the defendants approximately caused their injuries. There were procedural differences in those two cases. In Noyola, which is the older case, parents of schoolchildren sued the Board of Education for violations of the school code. They weren't using the statute as a predicate for a tort action, but they were trying to establish a private right of action under this statute to force the Board of Education to do what they thought the Board of Education was supposed to have done. The court did find a private right of action under this reasonable person standard, but the second case, so that was in 1997, the second case is Bencura, that was in 2010. And that's much more similar to what we have here in this case, because in that case, the plaintiff brought negligent training and negligent supervision counts against Kinkos for an employee's violations of the Notary Public Act. And that's what we have here where we're alleging there was a common law duty of care that was owed to the plaintiff under a negligence theory. In Bencura, the court built upon and essentially confirmed the exact same theory that was expressed by the Noyola court earlier, and that was that a statute can set the standard of conduct required by a reasonable person. And if a defendant violates those legislated rules, a plaintiff who belongs to the class who was intended to be protected may recover upon establishing that the defendant's conduct was a proximate cause of his injuries. We've alleged that John Webb belonged to the class that was intended to be protected. These allegations are in our third amended complaint at pages 1032 through 1037 of the record. We, of course, have alleged that the UIGEA was specifically enacted to address concerns related to unlawful internet gambling, and that's exactly what was going on in this case. Lakeside Bank had a specific statutory duty to identify and stop this gambling, but they didn't do that. And we alleged that Webb belonged to the class that was intended to be protected. So we think that gets us to the duty, and we think that he can recover if he can prove proximate cause. After hearing at the circuit court level and before the briefs were due in this appeal, a third Illinois Supreme Court case came out. That was the Doe v. Coe case, 2019 IL-1235-221. And that was the case where the minor was sexually assaulted by a youth pastor, and then her parents brought negligent supervision claims against the church. And the Illinois Supreme Court found that in deciding whether a duty exists, a court will consider the foreseeability of the plaintiff's injuries, the likelihood of the occurrence, the magnitude of the burden of guarding against it, and the consequence of placing that burden on the defendant. In our case, the magnitude of the burden of guarding against the situation that occurred here and the consequences of placing that burden upon the bank are minimal, if not non-existent, because that duty is already prescribed by federal law. They already have to identify and stop unlawful internet gambling under federal law. They can't deny that they have that obligation. So the burden is minimal. The real issue is the foreseeability of the injuries that we've alleged to the plaintiff here and the likelihood that those injuries would occur. And that ties into the next part of the argument relating to damages in this case. There's a glaring contradiction in the record that highlights the error made at the circuit court level here. You'll recall, and the court is aware, that there's a whole other portion of this case going on at the circuit court. The plaintiff has sued Mr. Idarosa and his co-conspirators for other claims not related to the bank's issues. There are certain counts that remain pending to this day against Idarosa and his co-conspirators. It's fraud, conspiracy to commit fraud, and conversion. These counts remain pending. They survived three rounds of motions to dismiss. The allegations under the fraud count are that Idarosa held these websites out to be licensed and legal sportsbooks. The allegations with respect to the conversion count are that there was money placed on deposit through this website into an online escrow account that had not been gambled yet. It was money on deposit that was sitting in an account. Mr. Idarosa allegedly terminated my client's access to that account, cut off his access to the website, and stole that money. So we are out money other than what was gambled with. That money had not been gambled yet. So the inconsistency here is that when we look at foreseeability, it's entirely foreseeable and likely that when you're dealing in this world of unlawful internet gambling, which is entirely unregulated and quite frankly most of the time could be run by criminals, the UIGEA is designed to protect the consumers from these situations. So what we had here was my client getting defrauded, we've alleged sufficient facts to continue on with our fraud count, and there was this money stolen from my client. So it's entirely foreseeable that these things would happen if a bank didn't abide by its obligations under federal law to cut off this illegal gambling operation. And that also ties in, you know, the court ruled that we couldn't allege damages against the bank. The court specifically said that we were attempting to create a fail-safe gambling strategy. In the circuit court's opinion, if my client would have won, he wouldn't have sued. If he lost, he sues the bank. According to the circuit court, my client was going to try to recover his money either way. Excuse me? Yes. Your time is up. Oh, I'm sorry, Your Honor. No, that's all right. I didn't know if you were aware of that. I didn't see that top box there. All right, thank you. And Mr. Baker, any response? Thank you, Your Honor. May it please the court, counsel, my name is Jeff Becker. I represent Lakeside Bank in this appeal. I'd like to start with a very simple principle here. No person should be permitted to use the judicial system as a means of creating a fail-safe gambling strategy. That is precisely what the appellate court is asking this court to do today. Appellate alleged in his pleadings that he engaged in unlawful gambling activities with Anthony Idarosa. He admits that he won some wagers, he claims he lost some wagers, and he concedes these activities started years before Mr. Idarosa became a member of Lakeside's board of directors and was merely a customer of the bank. But rather than take responsibility for his own actions in this case, appellate wants this court to save him from himself. Specifically, he wants a bank to pay him money he lost gambling because the bank did not discover that funds in one of its clients' accounts was purportedly related to these gambling activities. The Honorable Judge Rossi rejected appellant's request to do so, relying in part on Judge Posner's Seventh Circuit ruling in Sonnenberg v. Amaya, where he recognized that, quote, hordes of gamblers might be enticed to gambling websites if gamblers couldn't lose any money because the hosts of those websites would have to be reimbursed any losses they incurred. In other words, heads-eye-the-gambler-win entails you, the host, lose. In the trial level, Judge Rossi dismissed appellant's Third Amendment complaint on four independent bases. As Mr. Huseman mentions, he dismissed the case based on a lack of sufficient pleadings on duty, proximate cause, and damages. He also independently held that the appellant should be precluded from recovery because his injury was a result of his participation in admittedly illegal activities. For the trial court's ruling to be reversed here today, appellant must demonstrate the trial court erred in each of these determinations. This, appellant cannot do. Lakeside Bank therefore requests the court uphold the trial court's order dismissing the Third Amendment complaint with prejudice. As time allows, I'll briefly discuss each of the four determinations that Mr. Huseman touched on as well, beginning with duty of care. And it's really important to understand exactly how duty of care relates to this. The crux of appellant's argument in support of his claim that Lakeside owes him a duty of care is the BSA and UIGEA, which impose upon the bank certain compliance obligations. And according to plaintiff in his brief, this sets, quote, the minimum standard of conduct required of Lakeside under federal law. According to appellant, Lakeside owed him a duty of care under these regulations. As Mr. Huseman pointed out, the trial court disagreed, and the trial court is absolutely correct. Reliance on these regulations to impose a private tort claim on Lakeside must fail. First, there's no language in either statute that explicitly provides a private right of action, and several courts have held that neither regulation extends such rights by implication. We cited four of those cases in our brief, as well as in the underlying proceedings. That was Kairos versus Unibank, In re Baum, SFS Czech versus First Bank of Delaware, In re Agape. These are all cases that deal specifically with the UIGEA or the BSA. They're found in the record on page C1099. I don't want to spend a lot of time addressing Mr. Huseman's points on Rule 23. If that case should not have been cited or can't be relied upon, it can be stricken. As he did in the lower court saying, I only talked about one case, Rodriguez. That's not true. The record reflects that I made reference to multiple cases on this point. La Plume certainly would allow a court to cite it itself, but I also cite in my lower case, or in my appellate briefings today, Brinkley versus Brinkley and Wallace versus County Mutual Insurance, both on page 10 of my response brief, which made clear that the appropriate remedy would strike reliance upon that one case. In which case I almost have a half dozen other cases on point as well. But even more important than that, in an attempt to avoid the effect of those cases, appellate relies principally on two cases. The first case I'm going to talk about is a case called Noyola v. Dancura. Noyola v. Dancura is a case in which a private action could be implied under statute. The statute is only appropriate upon satisfaction of a four-part test. This is found on page 85 of the Noyola brief, where it cites Rogers v. St. Mary's Hospital of Decatur, another Illinois Supreme Court case from 1992, found at 149 Ailes 2nd 302. Now, those four prongs are essential to a negligence claim, to an extension of a tort claim based on violation of the statute. Step one is that the plaintiff must be a member of the class for whose benefit the statute was enacted. And Mr. Huston mentions multiple times that he alleged this. And he does allege this. On paragraph 60 and paragraph 191 of his Third Amendment complaint, these are the two places in the entire, I think, 20-something page complaint where he mentions the duty. He does say that his client is a member of the class to be protected. But then you go on from there. The other four prongs specifically mentioned in Noyola and Rogers and every case on this point say, step two, the private action is consistent with the underlying purpose of the statute. Step three, the plaintiff's injury is one the statute is designed to prevent. And most importantly, step four, the private action is necessary to provide an adequate remedy for violations of the statute. If a private claim by a gambler to go after a bank to recover his losses isn't necessary to provide an adequate remedy for the violation of the statute, then the negligence claim is not appropriate. When you apply Noyola to plaintiff's Third Amendment complaint, you find that appellant did generically allege he's a consumer, as defined by the UIGEA. But appellant falls woefully short of alleging any facts sufficient to satisfy the remainder of the test. He does not allege that his private right of action to recover gambling losses is consistent with the purpose of the statute, nor does he allege that his injury is the one the statute is designed to prevent. And most telling, he does not allege his claim is necessary to provide an adequate remedy. And it's not. It's absolutely unnecessary. This was recognized by the cases we cite. The UIGEA imposes criminal penalties on violator banks who don't comply with the statute. It provides state and federal authorities with the ability to bring civil proceedings to enjoin transactions prohibited under the statute, and it provides federal regulatory enforcement mechanisms. These are all remedies the statute already provides. So the ability of a gambler to go sue the bank to get his losses back does not seem necessary. And I'll also point out to you, appellant did have a statutory right to recover his losses in a civil action against the winner of those wages. That would be Mr. Idarosa under the GLRA. So I don't believe, if you look at the four corners of the complaint, the plaintiff alleged sufficient allegations to extend the duty of care by the bank onto him based on its alleged failure to comply with the BSA or the UIGEA. The issues before this court are virtually identical to those in Sonnenberg, where two men lost money gambling and then their mothers filed a lawsuit against the operators of the websites where their sons had placed their bets. The Seventh Circuit recognized that those websites did violate the law. Just like he's saying here, the website operators violated Illinois Criminal Code 720-ILCS-5-28-1. It's illegal to operate a website that permits unlawful gambling, but the court refused to extend to the plaintiffs the right to sue the operators vis-a-vis the GLRA. Rather, the court determined that that statute, the GLRA, provided the mothers with the right to sue the winners, not third parties. And as I cited at the beginning of this, Judge Posner recognized a policy. Gamblers would be enticed to gamble more if they couldn't lose money since they can go sue a third party, like a website operator, to get their money back. The same is true in this case. Unsuccessful gamblers are able, under the GLRA, to recover their losses from winners. This court need not expand those rights to also allow gamblers to sue a bank whose funds may have been deposited in their accounts. To do so would only encourage more unlawful gambling by providing gamblers with one more way to hedge their bets. So for that reason, the court should affirm the lower court's ruling on duty. With respect to proximate cause, and there's a difference here between proximate cause and duty, the trial court dismissed the case as well on proximate cause. In doing so, the court relied in part on Carter, which says, for proximate cause to exist in a negligent hiring claim, the employer's negligence must itself be the reason for the plaintiff's damage. Liability will only attach if, quote, injuries were brought by reason of the employment of the unfit employee. It's not just, did the employee violate the law, but is the hiring of this employee the reason that the individual plaintiff suffered damages? In this case, the pleadings make very clear. Appellant did not encounter Idarosa by reason of his alleged employment with the bank. And Judge McDade, I recognize your point. We do make a few points throughout our briefing that we don't concede that this individual, Idarosa, was an employee of the bank. He was an outside director. But unfortunately, with the pleadings as they're alleged, it's difficult for us to not accept the allegations as true. With that said, what we know here from the complaint, paragraphs 34 through 43, pages C1030 to 131, the plaintiff, the appellant, admittedly started gambling with Mr. Idarosa years before Idarosa joined the bank's board. The appellant knew Idarosa and interacted with him as a fellow gambler, not a purported bank employee. These allegations in the pleadings provided the trial court with a sufficient basis to dismiss appellant's pleadings, since it's clear the damages commenced well before Idarosa's alleged employment, which means his employment could not approximately cause the damages. But even after Idarosa became a member of the bank's board, the third amendment complaint is also devoid of any allegations that state that Idarosa gambled with the appellant while he was engaged in any of his job duties for Lakeside. This is where the Doe v. Coe case comes in, the counsel mentioned. It's distinguishable. In that case, there was a church pastor who assaulted a member of the church at the church while serving in his capacity as an employee of the church. Appellant, in this case, is neither a customer of the bank nor someone that interacted with Idarosa in his capacity as an employee of the bank. He gambled with this individual on the internet. Appellant alleges only, for the most part, that Idarosa used his influence as a board member to cover his gambling tracks. It therefore follows that Lakeside's alleged employment of Idarosa did not approximately cause appellant's alleged injuries. Rather, appellant's injuries occurred the moment he started gambling with Idarosa. And Idarosa's purported employment did nothing than, quote, furnish a condition, which made appellant's continued injury possible. But as Carter and the Cannon v. Commonwealth Edison case say, furnishing a condition that makes an injury possible isn't the proximate cause of the injury. The same is true here with respect to the failure by the alleged compliance officer to discover that Idarosa was gambling with appellant. We deny those allegations entirely, but recognize we're required by the pleadings to accept them as true. Even accepting them as true, the officer's failure to discover the gambling did not itself set off a sequence of unbroken events that caused appellant damage. On the contrary, a duty by the bank to discover unlawful gambling cannot exist until after the gambling's occurred. Gambling has to take place and then somehow get flagged by the bank later for them to even invoke their obligations in the EUIGEA. Thus, at best, gambling already happened, the damages already occurred, and the bank at most, again, furnished a condition that allowed appellant to continue gambling with Idarosa. The gambling, which was the actual cause of his injury. In some, under both scenarios, appellant already lost his money. He had already suffered losses and probably even winnings that would allow him to go on and get sued under the other GLRA case. Regardless, none of Lakeside's alleged conduct as a matter of law was the proximate cause of appellant's damages. And let's talk about damages for a moment. The trial court also held that appellant had not alleged the existence of damages sufficient to maintain his claim of negligence. In that regard, appellant crafted a complaint that actually says very little about his alleged damages. He says he suffered millions of dollars of gambling losses over a period of years. He doesn't say whether those losses outweighed his winnings. He does not allege when those losses supposedly happened, and that's essential. Because unlike a GLRA case that allows you to just sue for your losses regardless of your winnings, in this case, if the appellant says I lost $5 million, but in reality he won $10 million? He's up $5 million, and our client's alleged negligence did nothing but put money in his pocket. But regardless, he chose to attach to his complaint exhibits that show during the first year after Idarosa became a member of the bank, he was up $600,000. Now he says I don't have to prove anything now, but exhibits Trump allegations. And if he chooses to put those on there, that was his choice. He had multiple chances to fix this. He chose not to. Like any good gambler, he had the ability to attach what he wanted, but he was bluffing. And perhaps at this point, he didn't show the court enough of his hand, and it warranted dismissal of his complaint. And finally, illegality. This was an unlawful act. The GLRA is under the criminal code. He was a willful participant in the gambling. Whether he knew it was legal or not, he knew that he was gambling. The law allows for knowing wagers to be made that make it unlawful. The courts have long refused to assist a person who participates in a transaction forbidden by statute to claim damages growing out of such a transaction or to relieve himself of the consequences of his illegal act. And for all of these reasons, your honors, we ask that you please affirm the trial court, which dismissed a third amendment complaint on each of those four separate bases. Thank you for your time. Thank you, Mr. Treasurer. Mr. Guzman, any rebuttal? Yes, thank you, your honor. With respect to proximate cause and the final point made by counsel right here, the illegality, they tie in because with respect to proximate cause, the circuit court ruled that my client couldn't prove proximate cause because his own illegal conduct allegedly contributed to his damages. The problem and the great inconsistency here is that the court had already allowed our fraud count to stand, where we allege that we were defrauded by Ida Rosa into believing this website was legal. Gamblers don't know where these servers are located. Are they in the Caribbean, Costa Rica? Maybe the laws of the forum dictate whether this thing is legal or not. We had alleged sufficient facts to proceed to the trier of fact on whether there was fraud committed in representing the legality of these websites. Then, on the other hand, the court turns around and says, oh, Mr. Webb was engaging in illegal activity, but he already said that we had alleged enough facts to show that we had been defrauded into believing that it was actually legal. Those two things cannot coexist. And the only thing that makes sense is for this part of the case to go back because this proximate cause issue is an issue of fact. There are facts out there that potentially in discovery that would show that this was not my client knowingly engaging in illegal gambling. Counsel also spent a lot of time this afternoon talking about how we're attempting to create this fail-safe gambling strategy. But even if we can't recover our gambling losses, we've still alleged sufficient damages to survive a motion to dismiss. The gambling losses were only one category of damages that we argued at the hearing on the motion to dismiss in response to their motion. There were other categories of damage, specifically the money that was stolen from my client. The conversion count remains pending. We've alleged a sum of money on deposit that was not gambled with that Ida Rosa stole. That is damage regardless of whether my client lost or won money gambling or whether he ever gambled or not. Even if none of the gambling comes in, there was still money on deposit that was stolen from him. For that reason, Sonnenberg, the Sonnenberg case cited by counsel is also inapplicable. That case talks about there is another remedy. You can sue the winner to recover your own losses. That's fine. We have other damages against the bank besides gambling losses. We did also allege that the bank did furnish a condition that allowed my client to be damaged. Counsel is correct that my client did know Ida Rosa prior to his employment with the bank. He had actually gambled with them before he became a board member. The fact of the matter is the gambling operation exploded and flourished as a result of more than $10 million of loans that the bank gave him once he got on the board. The allegations in the complaint were that Ida Rosa was borrowing money from his own bank. He was buying real estate, using this money to essentially launder money through the purchase and sale of commercial real estate. And that money he was using to fund his bookmaking operation. That stuff didn't happen before Ida Rosa became a board member. I think the big inconsistency here with respect to this statement made by the circuit court and that was expanded on this afternoon by counsel about John Webb trying to create a fail-safe gambling strategy. That just shows the problem with the circuit court's ruling. Because as I've gone over time and time again this afternoon, even if my client is not allowed to recover anything relating to his gambling losses, and even if he took a net win, which he did not, there are still other damages that are available to us. And we did cite cases that say even nominal damages are sufficient to survive a 615 motion to dismiss. We don't have to itemize every possible category of damages that we are entitled to at this stage of the game. Nominal damages should be enough to survive a motion to dismiss. We've certainly alleged that, especially considering that the court found that we've alleged sufficient facts to survive the motion to dismiss on the conversion count. So we think the circuit court should be reversed. Thank you, Your Honors. Excuse me, Mr. Baker. We appreciate your argument today. Your vote takes this matter under advisement. We pass you with a written disposition within a short time. Thank you, Your Honor. And now we take a short recess.